BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**ETHAN D. KNIGHT, OSB #99298**
**GEOFFREY A. BARROW**
Assistant United States Attorneys
ethan.knight@usdoj.gov
geoffrey.barrow@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:16-CR-00051-BR** |
| **v.** | |
| **AMMON BUNDY, et al.,** | **GOVERNMENT'S SECOND RESPONSE TO DEFENDANTS' MOTIONS FOR SITE ACCESS** |
| **Defendants.** | |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and through Ethan D. Knight and Geoffrey A. Barrow, Assistant United States Attorneys, hereby responds to defendant Patrick's Request for Preservation of Evidence and for Provision of Defense Access to Crime Scenes (ECF No. 140), defendant Patrick's Motion for Hearing (ECF No. 141), Defendant Santilli's Motion to Join (ECF No. 144), and defendant Ammon Bundy's Motion to Amend Order to File Joint Statement (ECF No. 158).

## I.    Introduction

As the Court is surely aware, on January 2, 2016, numerous armed individuals, including some of the defendants in this matter, entered the Malheur National Wildlife Refuge (MNWR) in

Burns, Oregon, and announced their intention to occupy the land indefinitely.   An armed standoff

ensued and was not lifted until the last four occupiers (all of whom are also defendants herein)

surrendered to the FBI on February 11, 2016.

The MNWR consists of more than 187,700 acres of prime habitat, including 120,000 acres

of wetlands that provide a crucial stop for waterfowl along the Pacific Flyway.   Particularly

important to colonial waterbirds, sandhill cranes, and redband trout, the Refuge also encompasses

upland and riparian habitats vital to many migrating birds and wildlife.   The MNWR hosts over

320 bird species and 58 mammal species.   The MNWR supports over 20 percent of the Oregon

population of breeding greater sandhill cranes.   Refuge property includes more than 2000 miles of

water delivery ditches, 7 major irrigation dams, 450 miles of fence, and 2000 miles of roads and,

most relevant to this issue, approximately 24 structures and several abandoned or otherwise

standing vehicles at the site of the occupation.   This armed standoff was unprecedented in recent

history, and the government's efforts to process and collect evidence of the crimes which occurred

there are similarly unprecedented.

FBI Evidence Response Teams (ERT) began processing crime scenes at the MNWR on

February 13, 2016.   The government has estimated that it will take 21 days for ERT to complete

this work, although that estimate is subject to change.   The 24 structures located at the site, along

with numerous vehicles located there, must all be processed.   Tactical teams responsible for

initially securing the Refuge reported significant amounts of human feces in and around an

outdoor camping area.   They also reported that living quarters appear to house large food stores

that are spoiling.   In addition, firearms and explosives have been found on the site.   The FBI is

concerned that some of the vehicles or buildings may be booby trapped.

**Government's Second Response to Defendants' Motions for Site Access          Page 2**

In addition to the structures and vehicles that must be processed, a specialized FBI Art Crime Team (ACT) must process at least three impacted areas which include or are adjacent to sensitive cultural material.   Occupiers appear to have excavated two large trenches and an improvised road on or adjacent to grounds containing sensitive artifacts and materials.   To assure collection and protection of the potential cultural material items impacted by this activity, the processing of these areas will require careful and extensive processing.   Further complicating the processing of these sensitive cultural areas is the size and nature of trenches and the presence of human feces due to the creation of a latrine in one of the trenches.   The ACT is processing these sites, which requires equipment and securing of the trenches to allow safe access.   The excavation of these sensitive areas have potentially exposed sensitive cultural material which must be immediately collected and processed to avoid further damage and destruction.   Delaying the ongoing work will further jeopardize this material and expose these sensitive sites to further damage by both weather related events and wildlife.

By these motions, several defendants have demanded a court order requiring the FBI to allow attorneys or investigators to enter the MNWR and observe and/or participate in the government investigators' collection of evidence at this massive crime scene.   No case authority on point is cited in support of these motions.   Indeed, these requests are simply unprecedented. The motions should be denied for numerous reasons:

1.      Because it is the government's burden, not the defendants' burden, to gather the evidence correctly, while ensuring a proper chain of custody.

2.      Since one co-defendant could claim contamination by non-government investigators working for another co-defendant, the FBI should be allowed to finish its evidence

**Government's Second Response to Defendants' Motions for Site Access**          **Page 3**

recovery job professionally, as it is expected to do in this case as well as in any other criminal matter.

3.      Since some of the defendants in this case were arrested in other Districts and have yet to make an initial appearance in this matter, the requests for a court order requiring the FBI to halt its work until all 16 defense counsel can arrange to have investigators visit the scene could seriously interrupt the collection of evidence, and consequently delay the personnel of the Fish and Wildlife Service, who have been prevented from managing the Wildlife Refuge by the defendants' own actions, from getting back to their important work.

## II.     Argument

There is no case authority of which the government is aware, and defense counsel cumulatively do not cite to any such case, which suggests that generalized due process or a defendant's right to a fair trial gives the Court the authority to order the government to allow defense attorneys or investigators access to a crime scene while it is initially being processed for evidence.   Indeed, controlling case law suggests the contrary.   The Supreme Court has held that in order to justify dismissal of an indictment a defendant must show bad faith on the part of government agents if they destroy evidence after a defense discovery motion is filed.   *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (destruction of cocaine pursuant to standard procedure); *see also Arizona v. Youngblood*, 488 U.S. 51 (1988) (failure to preserve semen samples properly); *United States v. Estrada*, 453 F.3d 1208, 1212 (9th Cir. 2006) (sale of truck that contained evidence seized).   Here, defendants have proffered nothing to establish that the FBI ERT personnel are not processing the scene meticulously and collecting the physical evidence using their best efforts and with the utmost good faith.   It is the government's burden to do so.

**Government's Second Response to Defendants' Motions for Site Access**          **Page 4**

We recognize that some courts have held that "a federal court has the inherent power to order the preservation of evidence in the hands of a party before the Court," *United States v. Salad*, 779 F. Supp. 2d 503, 507 (E.D. Va. 2011) (ordering government to retain a private yacht that had been hijacked by pirates).   That power should not be extended to managing the initial physical collection of evidence at a crime scene.   The ongoing search at the MNWR is not a search being conducted with court authorization because the MNWR is government property, not a private location searched pursuant to court warrant.   Even if the court's power were so extensive, however, there is good reason for this Court not to exercise its discretion to use it.

Numerous practical problems would be caused by the issuance of such an order.   The risk to defense personnel untrained in approaching potential explosives or booby traps would be present.   The government has the burden of establishing a chain of custody for the evidence collected, but that requires a single chain of command at the site rather than the addition of 16 separate outside parties wandering around the scene "collecting evidence."

Defendant Ammon Bundy complains that without his requested order he will "be forced to depend upon the good will and diligence of State actors" to do their job properly, (ECF No. 158-1 at 3), as if that is anything but the normal and well-settled practice in criminal matters.   He further speculates that he may have a conflict with another co-defendant as to what might be exculpatory as to him but incriminatory as to another.   He offers no specific example of such a potential conflict and does not explain why the physical collection of evidence at the scene would favor another co-defendant over his position.   His suggestion that somehow a photograph taken today will not document what the scene looked like earlier when he was arrested is unremarkable, but he does not explain how his counsel's presence would "change" the photograph so that it is

**Government's Second Response to Defendants' Motions for Site Access**          **Page 5**

exculpatory.   This rank speculation does not justify the extraordinary relief that he seeks.

Indeed, it militates against it.   Allowing one defendant's investigator to interfere in the FBI's

collection of evidence would give a potentially conflicting co-defendant the opportunity to claim

that the evidence collection was contaminated by an outside, and adverse, party.

Nor does Rule 16 of the Federal Rules of Criminal Procedure, which governs discovery in

criminal cases, authorize a court to order access to a crime scene while it is being initially

processed.   Rule 16(a)(1)(E) requires the government to allow a defendant "to inspect and copy or

photograph" evidence material to preparing the defense, which the government intends to use in its

case-in-chief at trial, or belongs to a defendant.   That rule has never been interpreted to require the

government to allow defense representatives to attend the initial collection of that evidence.

In contrast, counsel have not articulated a single genuine reason why their individual clients'

interests cannot be adequately protected in this case by following the procedure used in all other

criminal cases.   Consistent with Rule 16, the government has offered to allow the defense to visit

the Refuge after the evidence processing is done, and to make the physical evidence collected

available for inspection at the FBI Field Office in Portland, consistent with standard FBI evidence

viewing protocols.[1]   Nothing further should be required.

Finally, several defendants in this case were arrested in other Districts, ordered detained,

and are being transferred to Portland by the U.S. Marshals Service.   Experience teaches us that it

may be some time before all arrive, retain or have local counsel appointed, and make a first

appearance before this Court.   Thus, it may be some time before representatives for all

defendants, who counsel concedes may have conflicting interests in this case, can arrange to have

---

[1]   The potential collection of evidence involving human remains will be treated differently by the FBI, in consultation with Burns Paiute tribal representatives.

**Government's Second Response to Defendants' Motions for Site Access**          **Page 6**

their separate representatives travel to the MNWR.    Therefore, granting the relief requested

would necessarily require the FBI to halt its present efforts to process the crime scene for an

indeterminate period.    That delay would consequently delay the return of MNWR employees and

other Fish and Wildlife or BLM officers to do the important work they are paid to do: maintain the

Refuge for the benefit of both the wildlife which inhabit the Refuge and American taxpayers who

wish to visit it in a lawful manner.

## III.    Conclusion

For the reasons given above, the defendants' various motions to seek access to the Malheur

National Wildlife Refuge while the FBI is processing the evidence should be denied.

Dated this 19th day of February 2016.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney


*s/ Geoffrey A. Barrow*
ETHAN D. KNIGHT, OSB #99298
GEOFFREY A. BARROW
Assistant United States Attorneys